JACKSON EXCHANGE BANK, Appellant, v. ANNIE E. RUSSELL, Executrix, et al., Respondents.

St. Louis Court of Appeals.    Argued and Submitted February 4, 1914.    Opinion Filed March 3, 1914.

1. **TRIAL PRACTICE: Equity Case: Function of Declarations of Law.** In an action in the nature of one in equity, tried as such, declarations of law need not be given.

2. **APPELLATE PRACTICE: Review: Absence of Declarations of Law.** In the absence of declarations of law, the appellate court will consider the evidence from the standpoint most favorable to the successful party below, and if the finding is supported by substantial evidence, the judgment will be affirmed.

3. ———: ———: **Finding of Referee.** The report of a referee stands as a special verdict, and if there is evidence tending to establish the facts found, the appellate court will not disturb the finding, but this rule is not applicable when the trial court

sustains exceptions to the report and makes an independent finding.

4. ———: ———: ———. The conclusiveness of the finding of a referee applies solely to his finding as to the facts, and does not apply to his conclusions of law, and the latter are open to examination in the appellate court in an equitable case as well as in actions at law.

5. REFERENCE: Compulsory Reference. A compulsory reference is proper in an action involving the examination of a long account.

6. ———: ———: Powers of Court. Where a compulsory reference is properly ordered, the trial court may exercise the surpervisory power of a chancellor over the proceedings before the referee, and the purpose of such reference being akin to equity jurisdiction, the appellate court has power to reverse the findings of the referee in the instances mentioned in the statute, and this is so whether the issues were commmitted to the referee by consent of the parties, or by order of the court without consent.

7. APPELLATE PRACTICE: Review: Equity Case: Reference. Where, in an action on a fidelity bond, a reference was made by consent, but the case was in fact one calling for a compulsory reference, as involving the examination of a long account, and the finding of the referee was set aside by the trial court on exceptions, without any findings of fact being made by such court, the whole case was reviewable by the appellate court, both on the facts and the law, as in a suit in equity.

8. PRINCIPAL AND SURETY: Liability of Surety. While the liability of a surety cannot be extended by construction or doubtful implication—and this rule is never relaxed in the case of individual sureties, who are generally such without compensation—yet a bond should be so construed as not to eliminate any, but to give effect to all, of its provisions.

9. ———: ———: Enlarging Obligations of Principal. In an action for the breach of the fidelity bond of a bank president, *held* that, although the evidence showed that duties not mentioned in the bond were cast upon the principal, the addition of such duties did not impose any more responsibility than rested on him by virtue of his office as president, and hence the surety was not discharged.

10. ———: ———: Acts Constituting Breach. Sureties on the bond of a bank president, who was also acting as bookkeeper, conditioned that he should faithfully demean himself in office, were not discharged on the theory that a conversion of the bank's funds was the act of the principal as bookkeeper, and

not as president, since his misfeasance as bookkeeper was known to him as president, and his failure to take steps, as president, to prevent and correct such misfeasance amounted to a breach of the condition of the bond.

Appeal from Cape Girardeau Circuit Court.—*Hon. C. B. Faris*, Judge.

REVERSED AND REMANDED (*with directions*).

*John A. Snider* and *Wilson Cramer* for appellant.

Having made it possible by their bond for Henry R. English, as "authorized to perform the duties of cashier," to have access to the vaults and handle the funds of the bank, the defendant sureties should be held responsible for his clearly established and admitted defalcation. They are estopped to deny the recital in the bond. Brewing Co. v. Niederweise, 28 Mo. App. 233; Hadley v. Fulbert, 73 Mo. 34; State ex rel. McKown v. Williams, 77 Mo. 463; Limberger v. Krieger, 88 Mo. 160.

*Albert M. Spradling, J. G. Miller* and *W. H. Miller* for respondents.

(1) The rule is well established to the effect that a surety is a favorite of the law, and his liability is not extended or varied beyond the strict terms of his contract. To the extent, and in the manner, and under the circumstances pointed out in his obligation, he is bound, and no further. Therefore, any alterations in the terms of the contract by the principals parties thereto, without the consent of the surety, will operate to discharge him therefrom, and of course, the rule applies to the contract of suretyship evinced by a building bond the same as any other surety. Martin v. White and Cox, 128 Mo. App. 117; Reissaus v. Whites, 128 Mo. App. 135. (2) The general rule is that any alteration in the contract by the principal

thereto, releases the surety, unless the surety consents to it. And the rule is so strict that the courts will not stop to inquire whether the alteration was injurious or beneficial to the surety. The reason is that contracts of suretyship are strictly construed in favor of the surety, and he has a right to stand upon the exact contract he made, and no one, not even the court, can change it in any respect. Higgins v. Harvester Company, 181 Mo. 300; Kelly v. Thuey, 143 Mo. 422; Hord v. Taubman, 79 Mo. 101; Bank v. Fricke, 79 Mo. 178; Moore v. Hutchinson, 69 Mo. 429; Bank v. Dunn, 62 Mo. 79; Evans v. Foreman, 60 Mo. 449; Haskell v. Champion, 30 Mo. 136. (3) There is no implied obligation whatever on the part of the sureties, and it cannot be said that they have undertaken more or other than that expressed in their contract; for it is only to the extent and in the manner and under the circumstances pointed out in the obligation the sureties are bound and no further. Harris v. Taylor, et al., 150 Mo. App. 291; Martin v. Whites, 128 Mo. App. 117; Reissaus v. Whites, 128 Mo. App. 135. (4) The president of a business corporation is its chief executive officer. He may, without any special authority from the board of directors, perform all acts of an ordinary nature, which, by usage or necessity, are incident to his office, and may bind the corporation by contracts in matters arising in the usual course of business. Roe v. Bank of Versailles, 167 Mo. 406; Spark v. Dispatch Company, 104 Mo. 531. (5) It is clear that the sureties could not be held for any defalcations of English as assistant cashier and bookkeeper, and they should not be held liable for any false entries made by him in order to conceal such defalcations, as they would be regarded as having been indirectly occasioned by the action of the bank in appointing him assistant cashier and bookkeeper. Home Savings Bank v. Traube, 75 Mo. 199.

STATEMENT.—Under date of June 11, 1898, Henry R. English, James W. Russell and T. E. McNeely, executed their bond to the Jackson Exchange Bank, a banking corporation of this State, in the sum of $5000, it being recited in the bond that Henry R. English had been duly elected by the board of directors of the bank "to the office of president of said institution and is actively engaged in said bank and authorized to perform the duties of cashier." The bond proceeds: "Now if said Henry R. English shall faithfully demean himself, in office, as such president and discharge the duties thereof, account for and pay over to his successor in office all money and property coming to his hands as such president, belonging to said bank, then this obligation to be void, otherwise to remain in full force and effect." It is further provided in the bond that it shall be "in force and effect from year to year during such time as the said Henry R. English shall be elected and re-elected to the said office of such president of said Jackson Exchange Bank." The minutes of the meetings of the board of directors of the bank were in evidence, covering the period from May 7, 1898, to July 1, 1906. From these it appears that Mr. English was re-elected president on May, 9, 1898, and was then also appointed bookkeeper and with H. R. Quinn elected a member of the executive committee, and that this bond was approved June 14, 1898, the recital being, "bond of H. R. English, president, and actively engaged in the bank and authorized to discharge the duties of cashier, in the sum of $5000, with J. W. Russell and T. E. McNeely as security, approved, which bond is placed in the custody of H. R. Quinn." It also appears that his salary as bookkeeper was fixed at $100 per month and that it remained at that sum until May 3, 1905, when it was fixed at $75, and so continued until May 12, 1906, the last election of Mr. English as president and bookkeeper. How soon after this

latter date he ceased to hold office with the bank, does not appear.

The by-laws of the bank, which were in evidence, provide, among other things, that the officers elected should consist of president, vice-president, as also cashier, "who in addition to his other duties shall be ex-officio secretary of said board, . . . who shall qualify and in all things conduct themselves in office as provided by the laws of this State relating to bank corporations." The board was also to appoint an executive committee of two members, and it appears that down to May 12, 1906, this executive committee consisted of Messrs. English and Quinn. Shortly afterward, this action was commenced on the bond against Messrs. English, Russell and McNeely. Mr. Russell dying pending the action, it was dismissed as to him, his wife as executrix being substituted and appearing to the action. It further appears that pending the action Mr. English was adjudicated bankrupt and the action was dismissed as to him.

The cause stood on amended pleadings. The amended petition, after setting out the death of Mr. Russell and the appointment of his wife as executrix, and reciting the fact that Mr. English, on the —— day of ——, 1898, had been duly appointed by the board president of plaintiff bank and was by its board of directors authorized to perform the duties of cashier of said bank, and on June 11, 1898, had accepted the office of president and acting cashier and, before entering upon his duties, made and executed and delivered to plaintiff, the bond above set out, that being set out in full. Averring that it was approved by the board on June 14, 1909, on its presentation to that body by Mr. English and its subsequent approval on the dates before mentioned, and the re-election of Mr. English as president and acting cashier, down to and including the election of May 12, 1906, it is averred that Henry R. English, as principal in

the bond, had breached it in the following particulars, namely: that he failed to faithfully demean himself in office as president and acting cashier of plaintiff bank and failed to discharge the duties of president and acting cashier, and failed to account for and pay over to his successor in office all money and property coming into his hands as such president and acting cashier of plaintiff bank belonging to the bank, and that the amount which he had so failed to account for and turn over to his successor in office or to plaintiff bank is far in excess of and over and above the sum of $5000, the penalty of the bond, to-wit, the sum of $23,000; that at the time the said English quit the service of the bank, on the —— day of July, 1906, the ''depositors' account'' of the bank was found to be short in the sum of $20,000, and that the ''depositors' account,'' ''long and short'' of journal entries showed a shortage of $11,650.96, the shortage being set out by years. It is further averred that Henry R. English was also bookkeeper and acting cashier of plaintiff bank from its organization in 1894 to July, 1906, and at all times had full access to the money of the bank and kept its accounts; that plaintiff bank had lost the sum of $23,000 from its vaults while H. R. English was custodian and cashier, as aforesaid; that plaintiff is unable to account for the shortage in ''depositors' account,'' as shown by the books of the bank, except through withdrawals of cash from time to time by English, bookkeeper and acting cashier aforesaid, and the appropriation of the same to his own personal use and benefit, thereby permanently depriving plaintiff bank of its money and property. Wherefore plaintiff alleges and charges that Henry R. English, custodian and cashier as aforesaid, has taken out and withdrawn from the vaults of plaintiff bank from January 6, 1903, to June 6, 1906, as shown by the ''depositors' account,'' $11,651 and appropriated the same to his own personal use and benefit,

wherefore judgment is demanded against defendants for the penalty of the bond.

The answer, after admissions of corporate character of plaintiff, death of J. W. Russell, appointment of executrix, execution of the bond, and a general denial, consists (1) of a denial of any default on the part of English, or of any indebtedness resulting from a violation of his bond, averring and charging "that whatever, if any, shortage or defalcation which might exist or has existed during the continuance of this bond on the part of Henry R. English, was due and is due to no fault or misfeasance of the said English in the capacity under which he was bonded. But if in fact there be a shortage, which defendants now again deny, it was due to errors, mistakes or whatever it may be, on the part of said English, as bookkeeper in said bank, and in no wise due to any act of his in the capacity covered by the alleged bond." (2) That Henry R. English was acting gratuitously as president or acting cashier of the bank, without any compensation whatever, and that the bond sued on was therefore without consideration. (3) That after English was elected president and after the bond was executed his duties were enlarged by making him bookkeeper, "thereby increasing the hazard of the risk assumed by these defendants by reason of which additional risk whatever shortage, if any, was created and brought about, and by reason of this fact these defendants are discharged," etc. (4) That the shortage complained of covered a period of four years and that plaintiff bank should have known the same, or did know, or by the exercise of ordinary care and prudence could have known it, and that by retaining the said Henry R. English in its employ after said first shortage was charged in the year 1903, and after knowledge of the fact, defendants were discharged from liability. (5) That Hugh R.

181 App. 45

Quinn owned and controlled the bank and that all things were done under his specific direction; that whatever errors there were in the books were due to his direction and action; that the knowledge of Quinn was the knowledge of the bank, and that it is estopped. (6) That whatever errors there were in the books were not due to any misconduct of English as president but were due to errors of English as bookkeeper, directed by the owner of the bank, and for which these defendants are not liable.

The cause being called for trial was referred by consent of parties to Frank Kelly, Esq., he as referee to hear all the testimony relating to the liability of the sureties and to report to the court. Afterwards at the August term of the court, the referee filed a report, in which he stated that the question presented to him for decision is whether a liability to plaintiff, on the part of the sureties, exists in the bond and under the facts which govern and control that liability, leaving out of consideration the question as to whether there is a shortage in the accounts of the bank. He further recites that the facts were not disputed, but the sufficiency of the facts to show a liability, or, even if sufficient, that they show a liability being denied, the question of law was presented as to whether the facts show a liability of the sureties on the bond to plaintiff. The referee found that the bond was a continuing one, accepted and approved at each meeting of the directors of plaintiff, from June 14, 1898, to May 12, 1906, inclusive. He found as a matter of law, that the entry in the minutes of the board, after the execution and acceptance of the bond, that Mr. English was acting as bookkeeper, threw no additional obligation on the sureties, finding, however, that considering the entry in the minutes, to the effect that Mr. English was "authorized to discharge the duties of cashier," in connection with the other phrase that he was "actively engaged in the bank," would lead

to the conclusion that the board recognized that at some time in the past Mr. English had been authorized to discharge the duties of cashier and that it was not a power and authority the board was then conferring on him but was the recording of a recognition of a power and authority previously conferred. The referee found, however, construing the action of the board, as shown by the minutes, with the bond, that the minutes of the board do not show that Mr. English was ever authorized to act as cashier, "and if that was all the testimony showed, it would end that phase, namely, the cashier phase, of the matter," so far as concerns a finding by the referee. But he also finds that the bond contains the same recitals of fact, and the question of whether the sureties can contradict the recitals of the bond is presented, or, putting it in another way, are the sureties estopped from denying that he was acting as cashier? In support of the proposition that they are estopped from disputing this recital, the referee cites Hundley v. Filbert, 73 Mo. 34; State ex rel. McKown v. Williams, 77 Mo. 463, and Schnaider Brewing Co. v. Niederweiser, 28 Mo. App. 233.

In answer to the contention of the attorneys for defendants, that plaintiff should also be estopped by its records, which show that Mr. English was elected president and bookkeeper and not cashier, the referee reports that while the records do not say Mr. English was not elected cashier but simply record that he was elected president and bookkeeper, those records being silent about his election as cashier, the affirmative and positive statement in the bond is permitted to overcome the silent and unexpressed negative contended for by defendants. He therefore held that the surties are bound by their bond to the admission that Mr. English was elected or was acting cashier, and he concludes that the sureties are bound by their bond to the admission, first, that Mr. English was actively

engaged in the bank, and, second, was authorized to perform the duties of cashier.

Continuing, the referee holds that under the law, the principal in the bond, being actively engaged in the bank and authorized to perform the duties of cashier, his sureties had agreed to be responsible for his acts as president and that that is all they were asked to become liable for by the terms of their contract, and that it was to be presumed that they contracted, knowing that the by-laws and the statutes provided at that time what the duties of the president of the bank were, and that the by-laws of the company and the statutes form part of the contract of the sureties, and that to the extent and manner and under the circumstances pointed out in his obligation, the surety is bound and no further, and that under the terms and conditions of the bond in suit, in which it is expressly stated that it is given to secure the acts of English, as president, it cannot be made to cover his acts as bookkeeper and acting cashier. [Home Savings Bank v. Traube, 75 Mo. 199, is cited for this.] The referee further finds that the sureties would be liable for any default as president on the part of English while he held the office; that the sureties would be liable for any default as president on the part of English while he held the office from May 14, 1898, although he may have abstracted one-third of the capital and surplus from 1903 to 1906, and that the failure of the directors to discover the shortage would not release them, citing State to use of the Southern Bank of St. Louis v. Atherton et al., 40 Mo. 209, l. c. 216; Chew et al. v. Ellingwood et al., 86 Mo. 260, l. c. 272, in support of this. The referee further found that there was a consideration for the signing of the bond by the sureties, for the consideration between the bank and English was sufficient consideration to support the contract of the sureties. He further found that the petition in the case stated a

cause of action. The conclusion of this report is that a legal liability exists on the part of the sureties, covering the acts and duties of Henry R. English as president of the bank but not as acting cashier, bookkeeper or custodian, and that for the plaintiff to recover in this action it will have to show the default of the principal of the bond as president and not in any other capacity. This report being submitted to the court, plaintiff filed exceptions to it. They were overruled and the case referred back to the same referee to resume his hearing of the case and report on the facts and the law.

Whereupon, afterwards, and at the August, 1911, term of court, the referee reported that he had again opened up the hearing and had taken testimony in the case and that he finds from the evidence that the records of the bank show that from January 1, 1903, to June 30, 1906, there was a total shortage of the funds of the bank of $10,047.78; that during the period covered by this shortage, the books of the bank were in charge of H. R. Quinn, as cashier, and Henry R. English, president of the bank, the latter authorized to perform the duties of cashier, and that he did perform all and any business in the bank as occasion offered, and was also the bookkeeper duly appointed, and that all the false entries, hiding and seeking to cover the money taken and made in all the books produced, except in a petit cash book, were made by Mr. English. In point of fact by written stipulation of counsel it was admitted "that Henry R. English was the president and bookkeeper of the Jackson Exchange Bank from May 14, 1898 (the date of the bond sued on), and that he was re-elected or appointed and served as such continuously from May 14, 1898, to July 1, 1906; and that during that time he kept the books of the bank, and that the bank had no other bookkeeper or president during that time, except during the temporary absence of a few days when the

cashier, Hugh R. Quinn, kept the books of the bank.''
During the examination of the expert who had audited
the books and was testifying concerning them, it was
admitted by counsel for defendants that all the entries
in these books and which had been referred to by the
expert, except a few pages covering small amounts,
were in the handwriting of Mr. English.

Taking up the amended answer of defendants by
paragraphs, and we refer to it by paragraphs as we
have before marked and set it out, the referee finds
as to the third paragraph or defense that, ''The rec-
ords show as appears from the testimony taken in the
first reference that on May 9, 1898, Mr. English was
appointed bookkeeper and the bond shows that it was
signed June 11, 1898, and was presented and approved
June 14, 1898, which is the finding on that fact by
the referee and is against defendants' contention.''

The referee finds that the fourth defense is not
allowed in law, even if the directors were negligent.
He cites in support of this State to use Bank v. Ather-
ton, 40 Mo. 210; Chew v. Ellingwood, 86 Mo. 206;
Third National Bank v. Owen, 101 Mo. 559; Brandt
on Suretyship & Guaranty, sec. 369.

As to the fifth defense, namely, that Hugh R.
Quinn owned and controlled the bank during all the
years named, and that all things were done under his
specific direction and control and that whatever errors,
if any, made, in the books or accounts of the bank,
were due to his direction or action, and that his knowl-
edge is the knowledge of the bank and that the bank
is therefore estopped from claiming damages, the ref-
eree finds that ''if that proposition were good in law,
then no corporation could ever recover on a bond
for the wrongful acts of its officers. The corporation
acts by its agent; knowledge of the agent is knowledge
of the corporation; the agent knows he is doing wrong,
therefore the corporation knows it and is estopped.
The corporation is only bound by the act of the agent

when the agent acts within his authority and within the scope of his duty. Certainly the authority of Quinn did not extend to that limit wherein he could consent that another employee of the bank might wrongfully take its money and falsify its books and estop the bank from recovering on the faithless officer's bond.

" 'Acts of manifest bad faith or breach of duty toward the corporation on the part of its president are not binding upon it.' [10 Cyc. 911, and authorities above; Brandt on Suretyship, sec. 476.]"

"Neither should such acts on the part of a cashier be binding, in the view of the referee. But the evidence does not sustain that position, and the referee finds against the defendants on the facts on that point, for there is no evidence offered that Quinn in any way directed or influenced English in a single act done or committed by him as an officer or employee of the bank."

On the sixth defense, namely, that there was no shortage of the bank, the referee finds that it is not sustained by the evidence, and he finds that there is a shortage and that $10,047.78 was taken from its cash from January 1, 1903, to June 30, 1906.

The report of the referee then proceeds: "That leaves the first and second reasons urged as a defense and they will be considered together, namely; whether the misfeasance of English was committed as president, and whether he, as president, received any salary as such, or whether his acts were gratuitous, and if gratuitous, whether there was any consideration for the sureties signing the bond."

After reciting the minutes of the board showing the election of Mr. English as president and bookkeeper, giving and approval of the bond, etc., as before referred to, the referee continues:

"The above is the record in brief as to the action of the directors. The condition of the bond sued on is:

'Now if the said Henry R. English shall faithfully demean himself in office as such president, and discharge the duties thereof, account for and pay over to his successor in office all money and property coming to his hands as such president, belonging to the bank, then this obligation to be void.'

"The referee finds that he did fail to faithfully demean himself in office as president and that he did fail to discharge the duties of such office, and that thereby was occasioned a breach of the bond as president. The referee finds that the large number of false entries made in the books by him, although made in the capacity of bookkeeper, were made with the knowledge and under the direction and hand of him as president also. He acted in the dual capacity and you cannot say that what wrong he did as bookkeeper was concealed from him as president, and as president it certainly was his duty to suppress and eliminate fraud and wrong doing, and if H. R. English, as bookkeeper, falsified the books to conceal a taking of the bank's money, H. R. English, as president, stood by and connived at the act and failed to take any steps to stop or prevent the wrong. He failed to demean himself in office as president and failed to discharge the duties, thereby committing a breach of the bond for which the sureties are liable.

"As to the gratuitous services, we believe that the election to the position of president, the filing of the bond for that trust, and discharging the duties of the place were a sufficient consideration to bind and hold the principal to the terms of the bond, and any consideration which supports his contract will support the contract of the surety.

"In the opinion of the referee there is a breach of the bond on the part of English as president and that the sureties are liable, and the referee recommends judgment be entered for the penalty of the bond."

Upon the coming in of this report, defendants filed exceptions, charging that the referee erred in his finding of facts; that his conclusion of facts is not justified by the evidence submitted on the trial; that he erred in his conclusions of law, and that the conclusions of law as stated by him do not follow from and are not sustained in any way by the facts as submitted by him, and that the referee in his finding of facts fails to distinguish between the liability of English personally and the liability of his bondsmen, who are only bonded for a specific duty, while English, if he defaulted at all, defaulted in another line of duty, for which these defendants never at any time undertook to bond him. Defendants therefore moved the court to ignore the referee's report, take up the facts itself and render judgment for defendants.

The cause was submitted to the court on these exceptions to the report of the referee, and the court making no findings nor giving any declarations of law, sustained the exceptions, the order sustaining them reciting that the court, having before it all the evidence taken in the separate hearings, and after seeing and hearing the same, finds the issues for defendants and against plaintiff. Judgment accordingly followed in favor of defendants. From this, after interposing its motion for new trial, as well as one in arrest, plaintiff has duly perfected its appeal to this court.

The learned counsel for appellant have assigned as error to the action of the trial court, error in sustaining defendants' exceptions to the second or final report of the referee, and in not confirming it; that under the law and the evidence, the finding and judgment should have been for plaintiff, and that the court erred in overruling plaintiff's motions for new trial and in arrest.

REYNOLDS, P. J. (after stating the facts).—It is contended by learned counsel for respondents, first, that the rule is well established to the effect that a surety is a favorite of the law and that his liability is not extended or varied beyond the strict terms of his contract; that he is bound to the extent and in the manner and under the circumstances pointed out in his obligation and no further. Second, that any alteration in the contract by the principal thereto, without the consent of the surety, will operate to discharge him therefrom, and that this rule is so strict that the courts will not stop to inquire whether the alteration was injurious or beneficial to the surety. Third, that there is no implied obligation on the part of the sureties. It is further argued that the president of a business corporation is its chief executive officer; that he may, without any special authority from the board of directors, perform all acts of an ordinary nature, which by usage or necessity are incident to his office, and may bind the corporation by contracts in matters arising in the usual course of business, but that it is clear that the sureties could not be held for any defalcation of the principal in this bond as assistant cashier and bookkeeper, and should not be held liable for any false entries made by him in order to conceal such defalcations, as they would be regarded as having been indirectly occasioned by the action of the bank in appointing him assistant cashier and bookkeeper, it being argued that the appointment of English, the principal in the bond as assistant cashier and bookkeeper, increased the hazard of the sureties and discharged them. Finally, it is argued that there is nothing before the court for review as no declarations of law were asked, and that the court properly sustained the exceptions to the report of the referee.

The learned referee has so fully and completely supported the positions which he took in his several

reports in this case, that it would be a work of supererogation to attempt to enlarge on it to any very great extent.

Taking up the last suggestion of the learned counsel for respondents, that there is nothing before our court for review as no declarations of law were asked, it is sufficient to say that by very many decisions it is the settled law of our State that in an action in the nature of one in equity, tried as such, no declarations of law need be given. The only effect of the absence of declarations of law when the case is to be reviewed by the appellate court, is that that court should consider the evidence from the standpoint most favorable to the successful party below—here the defendants—and if substantial evidence, supporting the finding, can be found, the judgment should be affirmed. [New York Life Ins. Co. v. McDearmon, 133 Mo. App. 671, l. c. 674, 114 S. W. 57.] In examining the testimony in this case, we have borne this rule in mind. "The report of a referee stands as a special verdict and if there was evidence tending to establish the facts found, the court will not disturb the finding." [Chew et al. v. Ellingwood, 86 Mo. 260, l. c. 269; State ex rel. Bell v. United States Fidelity & Guaranty Co., 236 Mo. 352, l. c. 375, 139 S. W. 163.] This does not apply, however, when the court does not confirm the report but sustains exceptions to it and makes an independent finding. [State ex rel. Kimbrell v. People's Ice Co., 246 Mo. 168, 151 S. W. 101.] But in the case at bar there was no finding of fact by the court. The only testimony before it was that taken before the referee, and whether the learned trial judge sustained the exceptions to that report because of errors in law or errors in fact, we are not advised. We have therefore no finding before us, save that of the referee, as to the facts in the case. On careful examination of that, we have reached the conclusion that his finding of facts is amply sustained by the testimony. The

conclusiveness of the finding of a referee, more correctly, giving it the force of a special verdict, applies solely to his finding as to the facts and does not apply to his conclusions of law. The latter are open to examination by the appellate tribunal as fully in an equitable case as in one at law, and this record before us is open to review both on the facts and the law. This is to be reviewed as a suit in equity. Although it appears that this reference was by consent, consent did not eliminate the fact that it was a case for compulsory reference, as involving the examination of a long account or of the books of the bank, to determine the amount of defalcation, if any. A reference is always proper as involving the examination of a long account. [Third National Bank v. Owen, 101 Mo. 558, l. c. 584, 14 S. W. 632; Vandagrift v. Masonic Home, 242 Mo. 138, l. c. 154; 145 S. W. 448.] In such a case a compulsory reference is proper. [State ex rel. Federal Lead Co. v. Reynolds et al., 245 Mo. 698, l. c. 702, 151 S. W. 85.] When a compulsory reference may be ordered under the statute, the court may exercise the supervisory power of a chancellor over the proceedings of a referee, and the purpose of such a reference is akin to equitable jurisdiction and in such case the appellate court has the full power to reverse the finding of the referee in the instances mentioned in the statute, and this is so whether the issues were committed to the referee by consent of both parties or by order of the court without the consent of either. [Reed v. Young, 248 Mo. 606, l. c. 612-613, 154 S. W. 766. So we held in Reifschneider v. Beck, 148 Mo. App. 725, 129 S. W. 232.] To repeat, we affirm the finding of the referee on the facts and agree with him on his conclusions of the law.

We can add little to the discussion of the learned referee of the law pertaining to construction of contracts of suretyship.

The position taken by the learned counsel for respondents on this point is hardly accurate; it leaves out of consideration a very important element entering into the construction of like contracts. The rule may be stated to be that while it is elementary law that the liability of sureties cannot be extended by a construction or by doubtful implication—and this is a rule never relaxed in the case of individual sureties, who are generally such without compensation—it is equally true that a bond should be so construed as not to eliminate but to give effect to all the provisions it contains. [Chew v. Ellingwood, supra, l. c. 270; Lionberger v. Krieger, 88 Mo. 160, l. c. 165; Beers v. Wolfe, 116 Mo. 179, l. c. 184; N. K. Fairbank Co. v. American Bond & Trust Co., 97 Mo. App. 205, l. c. 212, 70 S. W. 1096; Springfield Lighting Co. v. Hobart, 98 Mo. App. 227, l. c. 232, 68 S. W. 942; New York Life Ins. Co. v. McDearmon, supra, l. c. 678.]

We find no evidence of an enlargement or change of the duties of the principal in the bond for the time covered by the bond. While duties not mentioned in the bond, such as bookkeeper, were cast upon him, the minutes of the bank show that even before the giving of the bond and for all the period covered by it, the president had been discharging the duties of bookkeeper as well as acting cashier or assistant cashier during part of the time, but we are unable to see how the addition of these duties imposed any more responsibility than rested on the principal in the bond in his office as president. Even if it increased his labor, it did not do so to the extent of releasing the sureties. [Third National Bank v. Owen, supra.]

Nor is there any evidence of any fraudulent concealment of facts known to the bank, with knowledge of which facts the sureties may not have been willing to sign the bond. This point has been covered by the referee in his report and is fully sustained by the

decision in Third National Bank v. Owen, supra, l. c. 581-582.

The contention, and that is the chief one, of the counsel for respondents turns on the proposition that the defalcations of the principal in the bond were brought about by the acts of that principal as bookkeeper and not as president. We cannot accede to this proposition. The evidence is ample to sustain the conclusion that the act of conversion of the funds of the bank was the act of the president, and that his acts as bookkeeper were mere acts which effectually concealed the conversion or misapplication, not to use a harsher word, of the funds of the bank by its president. The bond held him to the faithful discharge of his duties as president and he surely cannot be said to have faithfully discharged those duties when, having converted the funds of the bank, he allowed that conversion to be concealed by the acts of the bookkeeper. For illustration, suppose another than Mr. H. R. English had been the bookkeeper of this bank, English the president. Knowing that this bookkeeper was making false entries to conceal defalcations or embezzlements of the moneys of the bank, and English, as president, chief officer, with full power of supervision even over the bookkeeper, which was undoubtedly an incident to his office as president, had stood by and condoned these acts of the bookkeeper, or been a party and privy to these false entries, could it be said that he had not been derelict in the discharge of his duties as president in not stopping these acts of the bookkeeper? Can it be denied that he was not only in privity with the bookkeeper but *particeps criminis,* an accomplice of, the bookkeeper in his criminal acts, and in a criminal act of this character, all participating in it were principals. Even conceding that as bookkeeper he effected concealment of the embezzlement, as president, he was a joint principal in that act and in that respect had grossly

failed in the faithful discharge of his duties as president. The acts of English as bookkeeper, known to English as president, were surely acts of misfeasance and of failure to faithfully discharge the duties of his office as president, and rendered him and his sureties liable upon the bond. [Home Savings Bank v. Traube, supra; Third National Bank v. Owen, supra, l. c. 580.]

A bond is not usually exacted of the president of a financial institution. The fact that English was required to give a bond is in itself suggestive that he was under more than the mere supervisory duties of president; indicates that he was, as president, to personally handle and look to the safe-keeping of the moneys of the bank.

Our conclusion is, that the action of the learned trial court in sustaining the exceptions to the referee's report is without support on the facts in the case, and that the conclusions of nonliability on the part of these defendant sureties is wrong. The judgment of the circuit court in this case is reversed and the cause remanded with directions to the circuit court to overrule the exceptions to the report of the referee and enter up judgment against the respondents in accordance with the finding of the referee for the penalty of the bond, and for interest thereon from the date of the filing of that report by the referee, to-wit, August 21, 1911, as well as for costs, and for execution accordingly. *Nortoni* and *Allen, JJ.*, concur.